## UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF FLORIDA

GOVERNMENT EMPLOYEES INSURANCE
CO., GEICO INDEMNITY CO., GEICO
GENERAL INSURANCE COMPANY and
GEICO CASUALTY CO.,

Plaintiffs,

-against-

JASON FRY,
CORNERSTONE NETWORK, INC.,
FRY ENTERPRISES, INC. d/b/a
CORNERSTONE MOBILE GLASS,
JAMES HAMILTON,
SUPHATTRA PRAPHATSARANG,
DWAYNE JOHNSON a/k/a DJ JOHNSON,
MATTHEW MIKA,
M & J GLASS COMPANY, LLC,
ALFONSO GARCIA,
A.B.S. ENTERPRISE, INC., and
JOHN DOE DEFENDANTS 1-10

Defendants.

Civil Action No. _____

**Plaintiffs Demand
a Trial by Jury**

### COMPLAINT

Plaintiffs Government Employees Insurance Co., GEICO Indemnity Co., GEICO General Insurance Company and GEICO Casualty Co. (collectively "GEICO" or "Plaintiffs"), as and for their Complaint against the Defendants, hereby allege as follows:

### INTRODUCTION

1.      This action seeks to terminate an ongoing fraudulent scheme committed against GEICO and, more broadly, the Florida automobile insurance industry, and to recover more than $223,000.00 that the Defendants have stolen from GEICO through the submission of hundreds of fraudulent claims seeking reimbursement for phony and otherwise unreimbursable windshield repair/replacement services (hereinafter, the "Glass Services") allegedly provided to individuals

who were eligible for glass repair/replacement coverage under comprehensive automobile insurance policies issued by GEICO ("Insureds").

2.      In addition to money damages, GEICO seeks a declaration that it is not legally obligated to pay reimbursement of more than $175,000.00 in outstanding claims for Glass Services that have been submitted or caused to be submitted by the Defendants through Defendants Cornerstone Network, Inc. and Fry Enterprises, Inc. d/b/a Cornerstone Mobile Glass (collectively, the "Cornerstone Companies"), because the claims were fraudulent in that they:

(i)      involved fraudulent or phony Glass Services that were not necessary, reparative, or actually performed;

(ii)     were the product of kickback relationships with car dealerships and car wash locations;

(iii)    were the product of illegal, deceptive, unfair, and manipulative conduct directed at GEICO Insureds; and

(iv)     were submitted through the Cornerstone Companies, which never actually performed the services and lacked standing to seek reimbursement from GEICO for the claims in the first instance.

3.      As more fully described in this Complaint, this multi-level scheme was engineered by the Defendants to create the appearance that the Cornerstone Companies were actual glass repair and replacement companies that provided Glass Services to Insureds.  In reality, the Cornerstone Companies were simply shell companies created and used by Jason Fry, James Hamilton, and Suphattra Praphatsarang (collectively, the "Cornerstone Owners") in furtherance of the Defendants' fraudulent scheme against GEICO and the Florida automobile insurance industry.

4.      In order to manufacture the large volume of fraudulent claims necessary to financially benefit themselves, the Cornerstone Owners paid a network of companies and individuals to illegally obtain insurance information, and illegally obtain or forge the Insureds'

signatures, and then to provide the information and "signatures" to the Cornerstone Owners and the Cornerstone Companies. The Cornerstone Owners and the Cornerstone Companies then used the illegally-obtained information and "signatures" to create fraudulent claims for Glass Services that they submitted to GEICO and other insurers.

5.    In particular, the Defendants generated a high volume of fraudulent claims for Glass Services by:

(i)    establishing relationships with – and paying financial incentives, or kickbacks, to – Florida car dealerships and car wash locations to gain access to the large volume of Insureds who visited the car dealerships and car wash locations;

(ii)    committing illegal, deceptive, unfair, and manipulative acts against the Insureds at the car dealerships and car wash locations, in order to unlawfully obtain the Insureds' signatures and insurance information; and

(iii)    using the Insureds' signatures and insurance information – without the Insureds' knowledge or consent – to create and submit fraudulent insurance claims to GEICO and other insurers for Glass Services, despite the fact that the putative Glass Services were unnecessary, had no reparative effect, and/or never were provided in the first instance.

6.    The Defendants fall into the following categories:

(i)    Defendants Cornerstone Network, Inc. ("Cornerstone Network") and Fry Enterprises d/b/a Cornerstone Mobile Glass ("Cornerstone Mobile") are Florida corporations that were created for the purpose of generating the fraudulent claims for Glass Services and submitting the fraudulent billing to automobile insurance companies, including GEICO.

(ii)    Defendants Jason Fry ("Fry"), James Hamilton ("Hamilton") and Suphattra Praphatsarang ("Praphatsarang") are the owners and operators of the Cornerstone Companies, and the persons who created and directed the fraudulent scheme.

(iii)    Defendants M & J Glass, LLC ("M&J Glass"), Matthew Mika ("Mika"), Dwayne Johnson a/k/a DJ Johnson ("Johnson"), Alfonso Garcia, ("Garcia"), A.B.S. Enterprise, Inc. ("ABS"), and John Doe Defendants 1-5 (collectively, the "Cultivator Defendants") were associated with and worked with the Cornerstone Companies and the Cornerstone Owners to: (a) establish relationships with and pay kickbacks to Florida car dealerships and car wash locations to gain access to the large volumes of Insureds who visited the car dealerships and car wash locations; (b) commit illegal, deceptive, and manipulative acts against the Insureds at the car dealerships and car wash locations, in order to unlawfully

obtain the Insureds' signatures and insurance information; and (c) use and/or transmit for use, the Insureds' signatures and insurance information – without the Insureds' knowledge or consent – to create and submit fraudulent insurance claims to GEICO and other insurers for Glass Services, despite the fact that the putative Glass Services were unnecessary, had no reparative effect, or never were provided in the first instance.

(iv)    Upon information and belief, John Doe Defendants 6-10 (collectively, the "Employee Defendants") worked on behalf of the Cornerstone Companies and the Cornerstone Owners, under the direction of the Cultivator Defendants, to: (a) establish relationships with and pay kickbacks to Florida car dealerships and car wash locations to gain access to the large volume of Insureds who visited the car dealerships and car wash locations; and (b) commit illegal, deceptive, and manipulative acts against the Insureds at the car dealerships and car wash locations, in order to unlawfully obtain the Insureds' signatures and insurance information.

7.    The organizational structure of the Defendants' fraudulent scheme is summarized in the following organizational chart:



8.     As discussed below, the Defendants at all relevant times have known that the charges for the Glass Services that they submitted, or caused to be submitted, to GEICO were fraudulent in that the putative Glass Services were: (i) unnecessary, had no legitimate reparative value, were the product of illegal, deceptive, unfair, and manipulative conduct directed at GEICO Insureds, and never actually were performed in the first instance, and (ii) submitted through the Cornerstone Companies, which never actually performed the services and lacked standing to seek reimbursement from GEICO for the claims in the first instance.

9.     As such, the Defendants do not now have – and never had – any right to be compensated for the Glass Services that they billed to GEICO.

10.    The charts annexed hereto as Exhibits "1" and "2" set forth a representative sample of the fraudulent claims for Glass Services that have been identified to-date that the Defendants submitted, or caused to be submitted, to GEICO.

11.    The Defendants' fraudulent scheme began as early as 2013 and has continued uninterrupted through the present day.

12.    As a result of the Defendants' scheme, GEICO has incurred damages of more than $223,000.00.

## THE PARTIES

### I.     Plaintiffs

13.    Plaintiffs Government Employees Insurance Co., GEICO Indemnity Co., GEICO General Insurance Company and GEICO Casualty Co. (collectively, "GEICO") are Maryland corporations with their principal places of business in Chevy Chase, Maryland. GEICO is authorized to conduct business and to issue automobile insurance policies in the state of Florida.

### II.    Defendants

## A.      The Cornerstone Owners

14.      Defendant Fry resides in and is a citizen of Florida.  Fry is one of the owners and operators of Cornerstone Mobile and Cornerstone Network.

15.      Fry developed and implemented the Defendants' fraudulent scheme, by paying the Cultivator Defendants and Employee Defendants to illegally obtain insurance information and Insureds' signatures, and then using this illegally-obtained information to create fraudulent claims for Glass Services that he and his co-Defendants submitted or caused to be submitted to GEICO and other insurers.

16.      Fry has an extensive criminal record that includes a felony conviction for attempting to obtain "a controlled substance by misrepresentation, fraud, forgery, deception, or subterfuge." 817.13(7)(a)(9) Fla. Stat. (West). Court records indicate that Fry currently is on parole.

17.      Defendant Praphatsarang resides in and is a citizen of Florida. Praphatsarang is Fry's wife, and is one of the owners and operators of Cornerstone Mobile and Cornerstone Network.

18.      Praphatsarang developed and implemented the Defendants' fraudulent scheme, by paying the Cultivator Defendants and Employee Defendants to illegally obtain insurance information and Insureds' signatures, and then using this illegally-obtained information to create fraudulent claims for Glass Services that she and her co-Defendants submitted or caused to be submitted to GEICO and other insurers.

19.      Defendant Hamilton resides in and is a citizen of Florida. Hamilton is one of the owners and operators of Cornerstone Network and Cornerstone Mobile.

20.    Hamilton developed and implemented the Defendants' fraudulent scheme, by paying the Cultivator Defendants and Employee Defendants to illegally obtain insurance information and Insureds' signatures, and then using this illegally-obtained information to create fraudulent claims for Glass Services that he and his co-Defendants submitted or caused to be submitted to GEICO and other insurers.

**B.    The Cornerstone Companies**

21.    Defendant Cornerstone Mobile is a Florida corporation with its principal place of business presently located 122 Normandy Drive, Tavernier, Florida 33584.  Cornerstone Mobile was incorporated in Florida on or about February 28, 2013. Since its formation in 2013, Cornerstone Mobile has been used by the Defendants as a vehicle to submit hundreds of fraudulent claims for Glass Services to GEICO.

22.    Defendant Cornerstone Network is a Florida corporation with its principal place of business presently located at 124 Palo Doro Drive, Islamorada, Florida, 33036, which was also Fry's and Praphatsarang's residential address.  Cornerstone Network was incorporated in Florida on or about December 8, 2014.   Since its formation in 2014, Cornerstone Network has been used by the Defendants as a vehicle to submit hundreds of fraudulent claims for Glass Services to GEICO.

23.    Cornerstone Network also was used by the Defendants to conceal their fraudulent scheme. Specifically, there was no material difference between Cornerstone Network's fraudulent business and operations and Cornerstone Mobile's fraudulent business and operations. The Cornerstone Owners caused Cornerstone Network to be incorporated, and to operate in a substantively identical manner to Cornerstone Mobile, in order to reduce the volume of

fraudulent billing submitted through any one of the two entities, avoid detection, and thereby conceal and perpetuate the Defendants' fraudulent scheme.

**C.     The Cultivator Defendants and the Employee Defendants**

24.     Defendant Johnson resides in and is a citizen of Florida. Johnson was associated with and worked with the Cornerstone Companies and the Cornerstone Owners to: (i) establish relationships with and pay kickbacks to Florida car dealerships and car wash locations in order to gain access to the large volume of Insureds who visited the car dealerships and car wash locations; (ii) commit illegal, deceptive, and manipulative acts against the Insureds at the car dealerships and car wash locations, in order to unlawfully obtain the Insureds' signatures and insurance information; and (iii) use the Insureds' signatures and insurance information – without the Insureds' knowledge or consent – to create and submit fraudulent insurance claims to GEICO and other insurers for Glass Services, despite the fact that the putative Glass Services were unnecessary, had no reparative effect, or never were provided in the first instance.

25.     Johnson has an extensive criminal history and has been convicted of multiple felonies.  Among other things, on October 31, 1995, Johnson was convicted of two counts of sexual battery of a victim under the age of 12 years old. As a result, Johnson is a registered sex offender in the State of Florida, and has been designated a "Sexual Predator".

26.     Defendant Mika resides in and is a citizen of the state of Florida, and is the owner and sole member of M&J Glass. Mika was associated with and worked with the Cornerstone Companies and the Cornerstone Owners to: (i) establish relationships with and pay kickbacks to Florida car dealerships and car wash locations in order to gain access to the large volume of Insureds who visited the car dealerships and car wash locations; (ii) commit illegal, deceptive, and manipulative acts against the Insureds at the car dealerships and car wash locations, in order

to unlawfully obtain the Insureds' signatures and insurance information; and (iii) use the Insureds' signatures and insurance information – without the Insureds' knowledge or consent – to create and submit fraudulent insurance claims to GEICO and other insurers for Glass Services, despite the fact that the putative Glass Services were unnecessary, had no reparative effect, or never were provided in the first instance.

27.     Defendant M&J Glass is a Florida limited liability corporation with its principal place of business located at 5621 Laver Street, Leesburg, Florida, 34748. M&J Glass was organized on or about September 15, 2015, and is the successor to a limited liability company known as IAL, LLC ("IAL").

28.     Both M&J and IAL are shell entities that have been operated by Mika to establish relationships with and pay kickbacks to Florida car dealerships and car wash locations and, thereby, to gain access to the large volume of Insureds who visited the car dealerships and car wash locations, so that the Defendants could enact their fraudulent scheme.

29.     Defendant Garcia resides in and is a citizen of Florida, and is the owner and sole shareholder of ABS. Garcia was associated with and worked with the Cornerstone Companies and the Cornerstone Owners to: (i) establish relationships with and pay kickbacks to Florida car dealerships and car wash locations in order to gain access to the large volume of Insureds who visited the car dealerships and car wash locations; (ii) commit illegal, deceptive, and manipulative acts against the Insureds at the car dealerships and car wash locations, in order to unlawfully obtain the Insureds' signatures and insurance information; and (iii) use the Insureds' signatures and insurance information – without the Insureds' knowledge or consent – to create and submit fraudulent insurance claims to GEICO and other insurers for Glass Services, despite

the fact that the putative Glass Services were unnecessary, had no reparative effect, or never were provided in the first instance.

30.     Defendant ABS was a Florida corporation from its incorporation on or about February 13, 2014 until its dissolution on or about September 22, 2015. Garcia was the operator and sole shareholder of ABS. ABS was a shell company that was operated by Garcia to establish relationships with and pay kickbacks to Florida car dealerships and car wash locations and, thereby, to gain access to the large volume of Insureds who visited the car dealerships and car wash locations, so that the Defendants could enact their fraudulent scheme.

31.     Despite the fact that ABS was dissolved on or about September 22, 2015, Garcia has continued to use the ABS name since September 22, 2015 in order to establish relationships with and pay kickbacks to Florida car dealerships and car wash locations and, thereby, to gain access to the large volume of Insureds who visited the car dealerships and car wash locations, so that the Defendants could enact their fraudulent scheme.

32.     Upon information and belief, John Doe Defendants 1-5 reside in and are citizens of Florida. John Doe Defendants 1-5 are individuals and entities, presently not identifiable, who – along with the other Cultivator Defendants – were associated with and worked with the Cornerstone Companies and the Cornerstone Owners to: (i) establish relationships with and pay kickbacks to Florida car dealerships and car wash locations in order to gain access to the large volume of Insureds who visited the car dealerships and car wash locations; (ii) commit illegal, deceptive, and manipulative acts against the Insureds at the car dealerships and car wash locations, in order to unlawfully obtain the Insureds' signatures and insurance information; and (iii) use the Insureds' signatures and insurance information – without the Insureds' knowledge or consent – to create and submit fraudulent insurance claims to GEICO and other insurers for

Glass Services, despite the fact that the putative Glass Services were unnecessary, had no reparative effect, or never were provided in the first instance.

33.     Upon information and belief, John Doe Defendants 6-10 reside in and are citizens of Florida. John Doe Defendants 6-10 are individuals and entities, presently not identifiable, who worked on behalf of the Cornerstone Companies and the Cornerstone Owners, under the direction of the Cultivator Defendants, to: (i) establish relationships with and pay kickbacks to Florida car dealerships and car wash locations in order to gain access to the large volume of Insureds who visited the car dealerships and car wash locations; and (ii) commit illegal, deceptive, and manipulative acts against the Insureds at the car dealerships and car wash locations, in order to unlawfully obtain the Insureds' signatures and insurance information.

## JURISDICTION

34.     This Court has jurisdiction over the subject matter of this action under 28 U.S.C. § 1332(a)(1) because the matter in controversy exceeds the sum or value of $75,000.00, exclusive of interest and costs, and is between citizens of different states.

35.     Pursuant to 28 U.S.C. § 1331, this Court also has jurisdiction over the claims brought under 18 U.S.C. §§ 1961 et seq. (the Racketeer Influenced and Corrupt Organizations ["RICO"] Act) because they arise under the laws of the United States.

36.     In addition, this Court has supplemental jurisdiction over the subject matter of the claims asserted in this action pursuant to 28 U.S.C. § 1367.

37.     Venue in this District is appropriate pursuant to 28 U.S.C. § 1391, as the Middle District of Florida is the District where one or more of the Defendants reside and because this is the District where a substantial amount of the activities forming the basis of the Complaint occurred.

## ALLEGATIONS COMMON TO ALL CLAIMS

38.     Plaintiff GEICO is an insurance company licensed and authorized to do business in the State of Florida. GEICO underwrites automobile insurance in Florida.

### I.     Automobile Insurance and Reimbursement for Glass Services

39.     Under Florida law, motorists are required to carry, at a minimum, insurance for Personal Injury Protection ("PIP") and Property Damage Liability ("PDL")(collectively, "No-Fault Insurance"). With limited exceptions that are not applicable here, No-Fault Insurance covers the costs of repairing property damaged in automobile accidents, as well as the healthcare costs of individuals who are injured in automobile accidents, regardless of who was at fault in the accidents.

40.     In addition to the required No-Fault Insurance, a large percentage of Florida automobile owners carry comprehensive insurance coverage, which provides coverage over and above mandatory No-Fault Insurance. Under a comprehensive insurance policy, repairs for damage outside of the context of covered accidents, such as weather damage, also are covered.

41.     In the event of damage to the windshield of an Insured with comprehensive insurance coverage, Florida law requires automobile insurers to replace or repair that Insured's damaged windshield with no deductible. 627.7288 Fla. Stat. (West).

42.     In a legitimate windshield repair or replacement setting, the windshield repair or replacement process begins when the Insured submits a notice of loss to GEICO.

43.     GEICO has established multiple means in order to facilitate the Insured's submission of a notice of loss. An Insured can submit the notice of loss either by telephone, or via the internet through a computer or mobile application.

44.     Pursuant to Florida law, Insureds with comprehensive insurance coverage have the sole discretion to determine who will perform a repair to, or a replacement of, their windshields. Insurers such as GEICO are prohibited from restricting an Insured's choice of windshield repair and replacement shops.

45.     As a result, as part of the notice of loss process, Insureds with comprehensive insurance coverage can identify the windshield repair or replacement shop where they wish to have the pertinent work performed. Key to this is actual communication between GEICO and its Insured to verify, among other things, that (i) a loss has taken place, (ii) the nature of the glass damage sustained, and (iii) the Insured's identification of the shop that has been designated to perform the repairs.

46.     Following the notice of loss, an Insured can assign his or her right to comprehensive insurance coverage benefits – i.e., windshield repair or replacement – to their preferred windshield repair/replacement shop in exchange for the shop's performance of the repair or replacement services.

47.     Once the Insured identifies their preferred windshield repair/replacement shop, GEICO transmits a work order to the Insured's selected shop.

48.     Then, pursuant to the Insured's assignment of benefits, the shop can perform the work and submit its invoice for the repair or replacement, together with the work order number, directly to GEICO for payment using an electronic billing or facsimile transmission system.

49.     Upon receipt of an invoice for windshield repair or replacement services provided to an Insured with comprehensive insurance coverage, Florida law generally permits insurers such as GEICO only thirty (30) days to handle the claim. See, e.g., Fla. Stat. § 626.9541. If insurers such as GEICO do not pay the claim within 30 days, or present some good reason for

denying or investigating the claim, they can be liable to the Insured or the Insured's assignee for damages, as well as attorneys' fees, under the Florida Unfair Insurance Trade Practices Act. See id.; see also Fla. Stat. § 624.155.

50.     While the 30-day claims handling period helps to ensure that legitimate claims are paid in a timely manner, it also creates perverse incentives for unscrupulous windshield repair and replacement fraud rings, such as the Defendants.

51.     GEICO receives approximately 2,000 windshield repair or replacement claims from Florida Insureds every day.

52.     Upon information and belief, other Florida automobile insurers similarly receive a very high volume of windshield repair and replacement claims each day.

53.     Unscrupulous windshield repair and replacement fraud rings – including the Defendants – are aware of the fact that the volume of windshield repair and replacement claims in Florida, coupled with the limited amount of time in which insurers in Florida must handle those claims, limit the insurers' ability to identify and investigate suspicious claims.

54.     Unscrupulous windshield repair and replacement fraud rings, such as the Defendants, routinely exploit these investigative and temporal limitations, by submitting a massive amount of fraudulent windshield repair and replacement claims for illusory and otherwise unreimbursable services, often without the Insureds' knowledge or consent.

55.     In this context, the notice of loss process described above plays an important role in ensuring that the windshield repair and replacement claims that GEICO receives are legitimate.   Among other things, it ensures that the windshield repair and replacement shops actually have received legitimate assignments of benefits from GEICO Insureds. It also ensures that the Insureds are aware of the fact that the glass repair and replacement shops have purported

to perform work on the Insureds' windshields, and have submitted claims for reimbursement under the Insureds' comprehensive insurance policies.

**II.** **The Defendants' Fraudulent Scheme**

56.     Beginning in 2013, and continuing through the present day, the Cornerstone Owners have masterminded and implemented a complex fraudulent scheme in which they billed GEICO and other Florida automobile insurers hundreds of thousands of dollars for illusory and otherwise unreimbursable Glass Services.

**A.** **The Creation of the Cornerstone Companies as Vehicles to Enact the Defendants' Fraudulent Scheme**

57.     As an initial step in the Defendants' fraudulent scheme, Fry, Praphatsarang, and Hamilton incorporated Cornerstone Mobile on or about February 28, 2013.

58.     Immediately thereafter, and as set forth in Exhibit "1", Fry, Praphatsarang, and Hamilton  began to submit a massive amount of fraudulent claims for Glass Services through Cornerstone Mobile to GEICO.

59.     However, Cornerstone Mobile never was a windshield repair or replacement shop of any kind.

60.     Cornerstone Mobile never owned or leased any office, trucks, or equipment.

61.     Cornerstone Mobile never had any employees.

62.     In fact, Cornerstone Mobile never actually provided any Glass Services of any kind to GEICO Insureds.

63.     For example, during a May 26, 2016 deposition – by which point GEICO had received many hundreds of discrete claims for Glass Services purportedly provided by Cornerstone Mobile – Fry acknowledged that Cornerstone Mobile never actually provided any Glass Services:

Q.    You don't do glass repairs, correct?

Λ:    No.  I used to, but I don't now, because I live in the Keys.

Q:    Right.    So Fry Enterprises, Inc. – no employee of Fry Enterprises or Fry Enterprises does not itself do glass repairs, correct?

A:    (Witness nods.)

64.    By late 2014, Fry, Praphatsarang, and Hamilton were growing concerned that the volume of fraudulent billing they were submitting through Cornerstone Mobile would draw the attention of insurer investigative departments and law enforcement.

65.    Accordingly, on or about December 8, 2014, they caused Cornerstone Network to be incorporated.

66.    Then, and as set forth in Exhibits "1" and "2", the Cornerstone Owners gradually decreased the amount of fraudulent billing for Glass Services that they were submitting through Cornerstone Mobile, and concomitantly began to submit the bulk of their fraudulent billing for Glass Services through Cornerstone Network.

67.    Like Cornerstone Mobile before it, Cornerstone Network never was a windshield repair or replacement shop of any kind.

68.    Cornerstone Network never owned or leased any office, trucks, or equipment – rather, to the extent that it maintained any operations at all in furtherance of the Defendants' fraudulent scheme, it operated from Fry's and Praphatsarang's home.

69.    Cornerstone Network never had any employees.

70.    In fact, Cornerstone Mobile never actually provided any Glass Services of any kind to GEICO Insureds.

71.    For example, during his May 26, 2016 deposition – by which point GEICO had received hundreds of discrete claims for Glass Services purportedly provided by Cornerstone

Network – Fry acknowledged that Cornerstone Network never actually provided any Glass

Services:

> Q:  So Cornerstone is not a glass repair facility?
> A:  We don't do repairs, no.
> Q:  So Cornerstone Networking [sic] has never performed glass repairs, correct?
> A:  We don't physically do glass, no.

72.     During that same May 26, 2016 deposition, Fry also gave testimony indicating

that Cornerstone Network and Cornerstone Mobile were not truly distinct entities, and that

neither Cornerstone Network nor Mobile had a physical business address:

> Q.  Do you have a business address?
> A:  I have a P.O. Box.
> Q.  What is that?
> A.  9657, I think. I'm not a hundred percent. I believe it's P.O. Box 967, Tavernier, Florida, 33070 zip. I'm not 100 percent on that.
> Q.  Where is Tavernier, Florida?
> A.  It's adjacent -- it's the upper key from Islamorada.
> Q.  And you use that as a business address?
> A.  That's where I get my mail.
> Q.  Do you have any other physical business address?
> A.  I don't think we do. I don't know. I'd have to look. We have a business address. It's, like, one of these kind of offices, but we're never there. Like, we collect mail, and we have somebody, that kind of thing.
> Q.  And when you say "we", who are you referring to?
> A.  Me, my company.
> Q.  And your company is?
> A.  Fry Enterprises Cornerstone Network. There is a we on Cornerstone Network, which is James Hamilton.

73.     The only discernable difference between the operations of Cornerstone Network

and Cornerstone Mobile concerned the "placement" of signatures on the claims submitted to

GEICO.

74.     While virtually all of the claims from Cornerstone Mobile represent that the

subject-Insured's signature on the underlying assignment of benefits was "on file," Cornerstone

Network routinely electronically transposed Insureds' signatures onto phony assignments of benefits without the Insureds' knowledge or consent – or forged them altogether.

75.     Otherwise, Cornerstone Network and Mobile operated identically and, for all intents and purposes, were one and the same.

76.     There was no legitimate reason why the Cornerstone Owners would require two separate entities, with two separate tax identification numbers, operating in a virtually identical manner, to submit claims for Glass Services to GEICO and other insurers.

77.     The reason why the Cornerstone Owners used two  separate  entities,  with  two separate tax identification numbers, operating in a virtually identical manner, to submit claims for Glass Services to GEICO and other insurers, was to reduce the amount of fraudulent charges for Glass Services that they submitted through any one entity, so as to avoid detection and thereby perpetuate the Defendants' fraudulent scheme.

**B.     The Structure and Execution of the Defendants' Fraudulent Scheme**

78.     In order to submit their fraudulent claims for Glass Services, the Cornerstone Owners and Cornerstone Companies required access to Insureds, their insurance information, and either real or forged copies of the Insureds' signatures.

79.     To gain access to Insureds, their insurance information, and either real or forged copies of the Insureds' signatures, the Cornerstone Owners and Cornerstone Companies recruited the Cultivator Defendants to illegally obtain copies of Insureds' insurance cards and signatures, without the Insureds' knowledge or consent.

80.     Toward that end, in exchange for compensation from the Cornerstone Owners and Cornerstone Companies, the Cultivator Defendants paid kickbacks to the owners and managers of car dealerships and car wash locations, in exchange for which the owners and managers of the

car dealerships and car wash locations permitted the Cultivator Defendants to have access to the premises at the car dealerships and car wash locations.

81.     Then, at the direction of the Cornerstone Owners and Cornerstone Companies, the Cultivator Defendants would either visit the car dealerships and car washes themselves, or would deploy the Employee Defendants to the car dealerships and car wash locations, where they would deceive Insureds, and obtain or steal their insurance information and signatures.

82.     Thereafter, the Cultivator Defendants would transmit the Insureds' insurance information and "signatures" back to the Cornerstone Owners and Cornerstone Companies, who would use the insurance information and the Insureds' putative "signatures" to create fraudulent claims for Glass Services that they then submitted to GEICO and other insurers.

83.     In virtually all of the claims for putative Glass Services identified in Exhibits "1" and "2", there was only minimal damage to the Insureds' windshields, or no visible damage at all.

84.     In the claims for putative Glass Services identified in Exhibits "1" and "2", no legitimate Glass Services ever actually were performed, by the Cornerstone Companies or anyone else.

85.     In most cases, the Cultivator Defendants and Employee Defendants would approach Insureds at the car dealerships and car wash locations, falsely inform the Insureds that their windshields were chipped or cracked, and offer to "repair" the chips or cracks at no cost to the Insureds.

86.     Then, the Cultivator Defendants and Employee Defendants – using a kit that contained a liquid that actually had no reparative value at all – would rub or insert the liquid into the Insureds' windshields, to no reparative end. The use of this useless liquid was intended to

give the false impression that some reparative action was being performed on the Insureds' windshields, when in fact it was not.

87.     In other cases, the Cultivator Defendants and Employee Defendants never even engaged with the Insureds at all, and simply created phony claims for Glass Services out of whole cloth.

88.     The Cultivator Defendants and Employee Defendants obtained the Insureds' insurance information by simply stealing it from within the Insureds' vehicles as they purported to perform the phony Glass Services, or by telling the Insureds that they needed the insurance information for their records, while falsely promising the Insureds that the information would not be used to submit an actual insurance claim.

89.     In many cases, the Cultivator Defendants and Employee Defendants obtained the Insureds' signatures by falsely promising the Insureds that – while no insurance claim would be made to the Insureds' insurers – the Employee Defendants needed the signatures for their records, to "authorize" the work, or to demonstrate to their "supervisors" that they actually were doing work.

90.     In other cases, the Cultivator Defendants and Employee Defendants simply forged the Insureds' signatures, without the Insureds' knowledge or consent.

91.     Then, the Employee Defendants and Cultivator Defendants would transmit the Insureds' insurance information and their purported signatures back to the Cornerstone Owners and Cornerstone Companies.

92.     Thereafter, the Cornerstone Owners and Cornerstone Companies would transpose the Insureds' putative "signatures" onto phony claims for Glass Services they submitted to

GEICO and other insurers, or else would falsely contend in their phony insurance claims that they had the Insureds' signatures "on file".

93.     For example, in a May 24, 2016 affidavit by Robert Audette ("Audette"), the general manager and part owner of the Bill Bryan automobile dealerships in central Florida, Audette swore that Mika approached him in 2015 and offered: (i) to have M&J Glass send representatives to the Bill Bryan dealerships, inspect the windshields of Bill Bryan dealership customers, and offer repairs "at no charge" to Bill Bryan dealership customers; and (ii) to pay the Bill Bryan dealerships between $10.00-$15.00 for each windshield that was repaired.

94.     As Audette stated:

> During my initial discussion with Mr. Mika, he informed me that he would have one of his "guys" located in each dealership service area inspect the windshields of our customers, and if a chip or crack was found, he would offer to repair the customer's windshield at a price of $60-$90, which he indicated was the amount that various automobile insurers in Florida pay for such repairs. At the time of my discussion with Mr. Mika, he expressly advised me that our customers would not incur any cost and would not otherwise be inconvenienced in any way, other than providing their electronic signature to authorize windshield repair work.

95.     Audette and the Bill Bryan dealerships accepted Mika and M&J Glass' offer, but then terminated the agreement in early 2016, because, as Audette stated:

> [C]ertain of M&J's business practices and ethics were called into question by numerous complaints from Bill Bryan customers. These include complaints that representatives of M&J placed customer's electronic signatures on documents not shown to the customers; on complaints that M&J representatives would go into customer glove boxes without authority to obtain vehicle insurance information; and complaints of M&J offering to repair customer windshields for 'chips' which were questionable at best.

96.     For example:

(i)     On August 18, 2015, an Insured named S.K. visited Bill Bryan Chrysler in Fruitland Park, Florida for scheduled service. At the dealership, S.K. was approached by one of Mika and M&J Glass' Employee Defendants, who offered to repair a chip in S.K.'s windshield. S.K. never provided the Employee Defendant with his insurance information, never authorized an insurance claim, and never signed an assignment of benefits. S.K. did, however, provide an

electronic signature on a tablet computer, which the Employee Defendant falsely represented was to authorize the scheduled service to S.K.'s vehicle, not to facilitate the submission of any insurance claim. Nonetheless, on September 24, 2015, without S.K.'s knowledge or authorization, Fry, Hamilton, and Cornerstone Network submitted a fraudulent claim to GEICO, seeking reimbursement in the amount of $161.25 for "windshield repair" services purportedly provided to S.K's vehicle. The claim falsely stated that S.K. had assigned his insurance benefits to Cornerstone Network, and S.K.'s signature had been electronically transposed on the claim without S.K.'s knowledge or consent.

(ii)     On August 23, 2015, an Insured named L.D. visited Bill Bryan Chrysler in Fruitland Park, Florida for scheduled service. At the dealership, L.D. was approached by two of Mika and M&J Glass' Employee Defendants, who offered to repair a chip in L.D.'s windshield and asked to see L.D.'s insurance card. L.D. was aware of a chip in her windshield, but declined to provide her insurance card and did not authorize any Glass Services. L.D. never authorized an insurance claim, did not assign her insurance benefits to anyone, and did not sign anything related to the offered Glass Services. Nonetheless, on September 24, 2015, without L.D.'s knowledge or authorization, Fry, Hamilton, and Cornerstone Network submitted a fraudulent claim to GEICO, seeking reimbursement in the amount of $161.25 for "windshield repair" services purportedly provided to L.D.'s vehicle. The claim falsely stated that L.D. had assigned her insurance benefits to Cornerstone Network, and L.D.'s signature was forged on the claim.

(iii)    On September 8, 2015, E.B., the husband of an Insured named D.B., visited Bill Bryan Chrysler in Fruitland Park, Florida for scheduled service. At the dealership, E.B. was approached by one of Mika and M&J Glass' Employee Defendants, who told E.B. that he could have two "pits" in his windshield repaired for "free" as a "courtesy" from Bill Bryan Chrysler. Under these false pretenses, E.B. authorized the representative to repair the windshield. E.B. observed the Employee Defendant insert liquid from a needle into the chips in the windshield. E.B. never provided the Employee Defendant with his insurance information, and never authorized anyone to file an insurance claim for the putative "repair". To the contrary, the Employee Defendant had represented to E.B. that the "service" would be provided for "free" as a "courtesy" from Bill Bryan Chrysler. Even so, on October 23, 2015, without E.B.'s knowledge or authorization, Fry, Hamilton, and Cornerstone Network submitted a fraudulent claim to GEICO, seeking reimbursement in the amount of $161.25 for "windshield repair" services purportedly provided to E.B.'s vehicle. The claim falsely stated that E.B. had assigned his insurance benefits to Cornerstone Network, and E.B.'s signature was forged on the claim.

(iv)    On September 14, 2015, an Insured named R.G. visited Bill Bryan Chrysler in Fruitland Park, Florida for scheduled service. At the dealership, R.G. was approached by one of Mika and M&J Glass' Employee Defendants, who told R.G. that there were some "nicks" in his windshield, and that the "nicks" could be

repaired for free. R.G. did not authorize any repairs to his windshield, but observed the Employee Defendant wipe the windshield with his hand. R.G. never provided the Employee Defendant with his insurance information – which was in his vehicle when he left it for service – never authorized an insurance claim, and never signed an assignment of benefits. Even so, on October 26, 2015, without R.G.'s knowledge or authorization, Fry, Hamilton, and Cornerstone Network submitted a fraudulent claim to GEICO, seeking reimbursement in the amount of $161.25 for "windshield repair" services purportedly provided to R.G.'s vehicle. The claim falsely stated that R.G. had assigned his insurance benefits to Cornerstone Network, and R.G.'s signature was forged on the claim.

(v)     On October 13, 2015, an Insured named E.D. visited Bill Bryan Kia for scheduled service. At the dealership, E.D. was approached by one of Mika and M&J Glass' Employee Defendants, who informed E.D. that there was a crack in his windshield. E.D. authorized the Employee Defendant to repair the crack, and – at the request of the Employee Defendant – provided an electronic signature on a tablet computer, ostensibly to authorize the work. Even so, no repairs actually were performed and – when E.D. left the dealership – his windshield was in the same condition as it was when he arrived. E.D. never provided the Employee Defendant with his insurance information, and never authorized anyone to file an insurance claim for the putative "repair". Nonetheless, on November 5, 2015, without E.D.'s knowledge or authorization, Fry, Hamilton, and Cornerstone Network submitted a fraudulent claim to GEICO, seeking reimbursement in the amount of $161.25 for "windshield repair" services purportedly provided to E.D.'s vehicle. The claim falsely stated that E.D. had assigned his insurance benefits to Cornerstone Network, and E.D.'s signature had been electronically transposed on the claim without E.D.'s knowledge or consent.

(vi)    On November 17, 2015, an Insured named L.J. visited Bill Bryan Chrysler in Fruitland Park, Florida for scheduled service. At the dealership, Johnson was approached by one of Mika and M&J Glass' Employee Defendants, who pointed out a small nick on L.J.'s windshield. The Employee Defendant informed L.J. that the nick could be fixed free of charge and that no insurance claim would be involved. When asked, L.J. informed the Employee Defendant that she was insured by GEICO, but provided no other information and never authorized an insurance claim. L.J. provided the Employee Defendant with an electronic signature, but never signed an assignment of benefits or a Cornerstone Network invoice. Nonetheless, on December 11, 2015, without L.J.'s knowledge or authorization, Fry, Hamilton, and Cornerstone Network submitted a fraudulent claim to GEICO, seeking reimbursement in the amount of $161.25 for "windshield repair" services purportedly provided to L.J.'s vehicle. The claim falsely stated that L.J. had assigned her insurance benefits to Cornerstone Network, and L.J.'s signature had been electronically transposed on the claim without L.J.'s knowledge or consent.

(vii)   On December 9, 2015, an Insured named A.L. visited Bill Bryan Chrysler in Fruitland Park, Florida for scheduled service. At the dealership, A.L. was approached by one of Mika and M&J Glass' Employee Defendants, who advised that he wanted to examine A.L.'s windshield. Upon examining the windshield, the Employee Defendant informed A.L. that there were "nicks" that could be repaired for free. The Employee Defendant never mentioned an insurance claim. A.L. observed the Employee Defendant insert liquid from a needle into the chips in the windshield. A.L. never provided the Employee Defendant with insurance information, authorized an insurance claim, and did not assign his insurance benefits to anyone. A.L. did not sign anything related to the Glass Services. Nonetheless, on December 31, 2015, without A.L.'s knowledge or authorization, Fry, Hamilton, and Cornerstone Network submitted a fraudulent claim to GEICO, seeking reimbursement in the amount of $161.25 for "windshield repair" services purportedly provided to A.L.'s vehicle. The claim falsely stated that A.L. had assigned his insurance benefits to Cornerstone Network, and A.L.'s signature was forged on the claim.

97.    Along similar lines, at the behest of the Cornerstone Owners and Cornerstone Companies, Mika and M&J Glass obtained access to Jenkins Hyundai in Leesburg, Florida by offering Jenkins Hyndai $25.00 for each putative windshield "repair" that they performed on the vehicles of Jenkins Hyundai's customers.

98.    Again, however, the Cornerstone Owners, Cornerstone Companies, Mika, and M&J Glass used the access to defraud GEICO and its Insureds.

99.    For example, on November 24, 2015, an Insured named J.C. visited Jenkins Hyundai for scheduled service. At the dealership, J.C. was approached by one of Mika and M&J Glass' Employee Defendants, who contended that there was a "ding" in J.C.'s windshield.

100.    Though J.C. did not observe any actual damage to his windshield, he authorized the Employee Defendant to repair the windshield under the assumption that the Employee Defendant worked at the dealership and that the work was part of the scheduled service.

101.    J.C. never authorized the Employee Defendant, or anyone else, to make an insurance claim for the putative repair, nor did J.C. every sign any assignment of benefits or other document authorizing such a claim.

24

102.    Even so, on December 9, 2015, without J.C.'s knowledge or authorization, Fry, Hamilton, and Cornerstone Network submitted a fraudulent claim to GEICO, seeking reimbursement in the amount of $161.25 for "windshield repair" services purportedly provided to J.C.'s vehicle.

103.    The claim falsely stated that J.C. had assigned his insurance benefits to Cornerstone Network, and J.C.'s signature had been electronically transposed on the claim without J.C.'s knowledge or consent.

104.    Similarly, at the behest of the Cornerstone Owners and Cornerstone Companies, Garcia, ABS, and Johnson provided $950.00 per month to Bucket of Sudz Car Wash ("Bucket of Sudz") in exchange for access to Bucket of Sudz's Tampa, Florida location, and $1,000.00 per month for access to Bucket of Sudz's Orlando, Florida location.

105.    Then, at the direction of the Cornerstone Owners and Cornerstone Companies, Garcia, ABS, and Johnson fraudulently obtained Insureds' insurance information at the Bucket of Sudz locations, fraudulently obtained or forged the Insureds' signatures, and transmitted the insurance information and signatures back to the Cornerstone Owners and Cornerstone Companies.

106.    Thereafter, the Cornerstone Owners and Cornerstone Companies used the putative signatures and insurance information to create fraudulent claims for Glass Services and to submit those claims to GEICO and other insurers.

107.    For example:

(i)     On April 1, 2015, an Insured named B.G. visited Bucket of Sudz's Orlando location for a car wash. At Bucket of Sudz, B.G. was approached by one of Garcia and ABS's Employee Defendants, who contended that he wanted to check B.G.'s windshield for damage. Though there was no visible damage to B.G.'s windshield, the Employee Defendant contended that he noticed a few scratches, and offered to repair them. B.G. declined the offer, at which point the Employee

Defendant asked to see B.G.'s insurance card, ostensibly because that was how his "company tracked that he was working". B.G. showed the Employee Defendant her insurance card. Thereafter, on May 12, 2015, without B.G.'s knowledge or authorization, Fry, Hamilton, and Cornerstone Network submitted a fraudulent claim to GEICO, seeking reimbursement in the amount of $161.25 for "windshield repair" services purportedly provided to B.G.'s vehicle. The claim falsely stated that B.G. had assigned her insurance benefits to Cornerstone Network, and B.G.'s signature was forged on the claim.

(ii)     On April 1, 2015, an Insured named P.H. visited Bucket of Sudz's Orlando location for a car wash. At Bucket of Sudz, P.H. was approached by one of Garcia and ABS's Employee Defendants, who contended that he was doing a free "window sampling". There was no damage to P.H.'s windshield, and the Employee Defendant never offered to make any repairs to P.H.'s windshield. However, the Employee Defendant asked to see P.H.'s insurance information, and contended that this was how his company tracked his work to ensure that he was not "lollygagging". Fort his same supposed reason, the Employee Defendant asked P.H. to place his electronic signature on a tablet computer. P.H. obliged, but never authorized the Employee Defendant to make any repairs, much less to submit any insurance claim. Even so, on May 12, 2015, without P.H.'s knowledge or authorization, Fry, Hamilton, and Cornerstone Network submitted a fraudulent claim to GEICO, seeking reimbursement in the amount of $161.25 for "windshield repair" services purportedly provided to P.H.'s vehicle. The claim falsely stated that P.H. had assigned his insurance benefits to Cornerstone Network, and P.H.'s signature was forged on the claim.

(iii)    On April 28, 2015, an Insured named N.M. visited Bucket of Sudz's Orlando location for a car wash. At Bucket of Sudz, N.M. was approached by one of Garcia and ABS's Employee Defendants, who contended that she worked for the car wash, that N.M.' windshield had some "dings", and that she could do a "free repair". The Employee Defendant then proceeded to rub an unknown liquid on N.M.'s windshield with a cloth, which did not in any way actually have any effect on N.M.' windshield. N.M. never provided the Employee Defendant with her insurance information, nor did she ever sign any documents or other materials at Bucket of Sudz. Even so, on June 10, 2015, without N.M.'s knowledge or authorization, Fry, Hamilton, and Cornerstone Network submitted a fraudulent claim to GEICO, seeking reimbursement in the amount of $161.25 for "windshield repair" services purportedly provided to N.M.'s vehicle. The claim falsely stated that N.M. had assigned her insurance benefits to Cornerstone Network, and N.M.'s signature was forged on the claim.

(iv)     On May 1, 2015, an Insured named B.R. visited Bucket of Sudz's Orlando location for a car wash. At Bucket of Sudz, B.R. was approached by one of Garcia and ABS's Employee Defendants, who contended that B.R.'s windshield had chips in it and that he could fix them for free. The Employee Defendant asked to see B.R.'s insurance card, which she provided. However, B.R. then informed the

Employee Defendant that she was not interested in having her windshield repaired or in filing an insurance claim. B.R. never authorized – nor did the Employee Defendant ever perform – any Glass Services, much less services to support an insurance claim. Thereafter, on June 24, 2015, without B.R.'s knowledge or authorization, Fry, Hamilton, and Cornerstone Network submitted a fraudulent claim to GEICO, seeking reimbursement in the amount of $161.25 for "windshield repair" services purportedly provided to B.R.'s vehicle. The claim falsely stated that B.R. had assigned her insurance benefits to Cornerstone Network, and B.R.'s signature was forged on the claim.

(v)     On May 20, 2015, an Insured named R.A. visited Bucket of Sudz's Orlando location for a car wash. R.A. never spoke with anyone at Bucket of Sudz regarding Glass Services, never provided anyone at Bucket of Sudz with her insurance information, and never provided anyone at Bucket of Sudz with her signature. Nor, by extension, did R.A. ever authorize any Glass Services on her vehicle, or the submission of any insurance claim predicated on any Glass Services. Even so, on June 3, 2015, Fry, Hamilton, and Cornerstone Network submitted a fraudulent claim to GEICO, seeking reimbursement in the amount of $161.25 for "windshield repair" services purportedly provided to R.A.'s vehicle on May 20, 2015. The claim falsely stated that R.A. had assigned her insurance benefits to Cornerstone Network, and R.A.'s signature was forged on the claim.

(vi)    On August 24, 2015, the vehicle of an Insured named B.M. was driven by B.M.'s daughter's boyfriend A. to Bucket of Sudz's Tampa location for a car wash. At Bucket of Sudz, A. was approached by Johnson, who informed A. that B.M.'s windshield was chipped and needed repairs. A. did not see any chips on the windshield, and declined any repairs. Johnson asked to see the insurance card for B.M.'s vehicle, and asked A. to sign a form, ostensibly to prove to his employer that he was working. A. obliged, but never authorized Johnson to make any repairs, much less to submit any insurance claim. Even so, on September 22, 2015, without B.M.'s or A.'s knowledge or authorization, Fry, Hamilton, and Cornerstone Network submitted a fraudulent claim to GEICO, seeking reimbursement in the amount of $160.50 for "windshield repair" services purportedly provided to B.M.'s vehicle. The claim falsely stated that B.M. had assigned his insurance benefits to Cornerstone Network, and B.M.'s signature was forged on the claim.

(vii)   On October 2, 2015, an Insured named J.B. visited Bucket of Sudz's Tampa location for a car wash. At Bucket of Sudz, J.B. was approached by Johnson, who informed J.B. that her windshield was chipped and needed repairs. The Employee Defendant asked J.B. if she had insurance, and J.B. showed him her insurance card, but stated that she did not want an insurance claim to be placed. Indeed, J.B. repeatedly sought to confirm with Johnson that no claim would be filed on her insurance policy, and Johnson repeatedly confirmed to J.B. that no insurance claim would be made. Johnson then proceeded to rub an unknown liquid on J.B.'s windshield with a cloth, which did not in any way actually repair the chips in

J.B.'s windshield. At no point did J.B.'s sign any documents authorizing an insurance claim, or the assignment of her insurance benefits to any person or entity. Even so, on October 22, 2015, without J.B.'s knowledge or authorization, Fry, Hamilton, and Cornerstone Network submitted a fraudulent claim to GEICO, seeking reimbursement in the amount of $161.25 for "windshield repair" services purportedly provided to J.B.'s vehicle. The claim falsely stated that J.B. had assigned her insurance benefits to Cornerstone Network, and J.B.'s signature was forged on the claim.

(viii)   On November 30, 2015, S.R. – the daughter of an Insured named L.T. – visited Bucket of Sudz's Tampa location to get L.T.'s vehicle washed. At Bucket of Sudz, S.R. was approached by Johnson, who informed S.R. that L.T.'s windshield was cracked and needed repairs. S.R. did not consent to have any Glass Services performed on November 30, 2015, nor did she authorize the submission of any insurance claims. S.R. did, however, provide Johnson with L.T.'s insurance information and made an appointment to return to Bucket of Sudz to get the windshield repaired. However, S.R. missed the appointment, and no Glass Services were ever performed on L.T.'s vehicle. Even so, on February 29, 2016, without S.R.'s or L.T.'s knowledge or authorization, Fry, Hamilton, and Cornerstone Network submitted a fraudulent claim to GEICO, seeking reimbursement in the amount of $774.76 for windshield "tinting" services purportedly provided to L.T.'s vehicle, despite the fact that neither S.R. nor L.T. ever had any "tinting" services performed on L.T.'s vehicle, much less authorized any insurance claims for "tinting" services.

108.     After obtaining Insureds' insurance information and signatures through a pattern of fraud and misrepresentation aimed at the Insureds, themselves, the Cornerstone Owners and Cornerstone Companies used that insurance information and those signatures to submit hundreds of fraudulent claims to GEICO.

109.     In some cases, the Cornerstone Owners and Cornerstone Companies created fraudulent claims for Glass Services, and submitted those claims to GEICO, without even having any interaction with the Insureds at all.

110.     For example, on April 29, 2015, the Cornerstone Owners and Cornerstone Network submitted a claim to GEICO, seeking reimbursement in the amount of $161.25 for purported repairs to the windshield of an Insured purportedly named "Jose Verez" with a policy number of 4275462309 and an address of "10540 Monfeler Cr, Orlando, FL 32821".

111. The claim was forged with "Jose Verez's" signature, and falsely represented that "[t]his customer has signed an assignment of benefits".

112. In fact, policy number 4275462309 was held by an Insured named Jose Perez-Nieves, not an Insured named "Jose Verez".

113. Jose Perez-Nieves never heard of Cornerstone Network, never authorized Cornerstone Network or anyone else to make repairs on his windshield, and no repairs ever had been made on Perez-Nieves' windshield. By extension, Perez-Nieves never authorized Cornerstone Network to submit any claim to GEICO for repairs to his windshield.

114. Each of the claims submitted or caused to be submitted by the Defendants through the Cornerstone Companies – which are identified in Exhibits "1" and "2" – falsely represented to GEICO that: (i) either Cornerstone Mobile or Cornerstone Network actually provided the underlying Glass Services; (ii) either Cornerstone Mobile or Cornerstone Network actually had a valid assignment of benefits from the pertinent Insured; and (iii) that some legitimate, reparative Glass Services actually had been provided to the Insureds.

115. In fact, in each of the claims for Glass Services identified in Exhibits "1" and "2": (i) neither Cornerstone Mobile nor Cornerstone Network actually provided any underlying Glass Services; (ii) neither Cornerstone Mobile nor Cornerstone Network actually had any valid assignment of benefits from the pertinent Insured; and (iii) no legitimate, reparative Glass Services actually had been provided to the Insureds in the first instance.

116. For example:

(i)     On or about June 27, 2014, the Cornerstone Owners submitted a claim through Cornerstone Mobile to GEICO in the amount of $738.12 for Glass Services purportedly provided to an Insured named G.M. The claim falsely represented: (a) that Cornerstone Mobile actually provided the Glass Services; (b) that Cornerstone Mobile actually had a valid assignment of benefits from G.M.; and

        (c) that some legitimate, reparative Glass Services actually had been provided to G.M.

(ii)      On or about June 27, 2014, the Cornerstone Owners submitted a claim through Cornerstone Mobile to GEICO in the amount of $770.38 for Glass Services purportedly provided to an Insured named B.S. The claim falsely represented: (a) that Cornerstone Mobile actually provided the Glass Services; (b) that Cornerstone Mobile actually had a valid assignment of benefits from B.S.; and (c) that some legitimate, reparative Glass Services actually had been provided to B.S.

(iii)    On or about July 10, 2014, the Cornerstone Owners submitted a claim through Cornerstone Mobile to GEICO in the amount of $572.96 for Glass Services purportedly provided to an Insured named A.M. The claim falsely represented: (a) that Cornerstone Mobile actually provided the Glass Services; (b) that Cornerstone Mobile actually had a valid assignment of benefits from A.M.; and (c) that some legitimate, reparative Glass Services actually had been provided to A.M.

(iv)    On or about July 23, 2014, the Cornerstone Owners submitted a claim through Cornerstone Mobile to GEICO in the amount of $479.05 for Glass Services purportedly provided to an Insured named D.S. The claim falsely represented: (a) that Cornerstone Mobile actually provided the Glass Services; (b) that Cornerstone Mobile actually had a valid assignment of benefits from D.S.; and (c) that some legitimate, reparative Glass Services actually had been provided to D.S.

(v)     On or about October 21, 2014, the Cornerstone Owners submitted a claim through Cornerstone Mobile to GEICO in the amount of $160.50 for Glass Services purportedly provided to an Insured named L.F. The claim falsely represented: (a) that Cornerstone Mobile actually provided the Glass Services; (b) that Cornerstone Mobile actually had a valid assignment of benefits from L.F.; and (c) that some legitimate, reparative Glass Services actually had been provided to L.F.

(vi)    On or about October 23, 2014, the Cornerstone Owners submitted a claim through Cornerstone Mobile to GEICO in the amount of $160.50 for Glass Services purportedly provided to an Insured named S.G. The claim falsely represented: (a) that Cornerstone Mobile actually provided the Glass Services; (b) that Cornerstone Mobile actually had a valid assignment of benefits from S.G.; and (c) that some legitimate, reparative Glass Services actually had been provided to S.G.

(vii)   On or about October 29, 2014, the Cornerstone Owners submitted a claim through Cornerstone Mobile to GEICO in the amount of $160.50 for Glass Services purportedly provided to an Insured named L.C. The claim falsely represented: (a) that Cornerstone Mobile actually provided the Glass Services; (b) that Cornerstone Mobile actually had a valid assignment of benefits from L.C.; and (c) that some legitimate, reparative Glass Services actually had been provided to L.C.

(viii)   On or about November 10, 2014, the Cornerstone Owners submitted a claim through Cornerstone Mobile to GEICO in the amount of $502.18 for Glass Services purportedly provided to an Insured named J.A. The claim falsely represented: (a) that Cornerstone Mobile actually provided the Glass Services; (b) that Cornerstone Mobile actually had a valid assignment of benefits from J.A.; and (c) that some legitimate, reparative Glass Services actually had been provided to J.A.

(ix)   On or about December 1, 2014, the Cornerstone Owners submitted a claim through Cornerstone Mobile to GEICO in the amount of $646.63 for Glass Services purportedly provided to an Insured named J.D. The claim falsely represented: (a) that Cornerstone Mobile actually provided the Glass Services; (b) that Cornerstone Mobile actually had a valid assignment of benefits from J.D.; and (c) that some legitimate, reparative Glass Services actually had been provided to J.D.

(x)   On or about December 17, 2014, the Cornerstone Owners submitted a claim through Cornerstone Mobile to GEICO in the amount of $160.50 for Glass Services purportedly provided to an Insured named E.B. The claim falsely represented: (a) that Cornerstone Mobile actually provided the Glass Services; (b) that Cornerstone Mobile actually had a valid assignment of benefits from E.B.; and (c) that some legitimate, reparative Glass Services actually had been provided to E.B.

(xi)   On or about April 29, 2015, the Cornerstone Owners submitted a claim through Cornerstone Network to GEICO in the amount of $161.25 for Glass Services purportedly provided to an Insured named K.M. The claim falsely represented: (a) that Cornerstone Network actually provided the Glass Services; (b) that Cornerstone Network actually had a valid assignment of benefits from K.M.; and (c) that some legitimate, reparative Glass Services actually had been provided to K.M.

(xii)   On or about April 29, 2015, the Cornerstone Owners submitted a claim through Cornerstone Network to GEICO in the amount of $996.79 for Glass Services purportedly provided to an Insured named W.M. The claim falsely represented: (a) that Cornerstone Network actually provided the Glass Services; (b) that Cornerstone Network actually had a valid assignment of benefits from W.M.; and (c) that some legitimate, reparative Glass Services actually had been provided to W.M.

(xiii)   On or about April 29, 2015, the Cornerstone Owners submitted a claim through Cornerstone Network to GEICO in the amount of $161.25 for Glass Services purportedly provided to an Insured named E.D. The claim falsely represented: (a) that Cornerstone Network actually provided the Glass Services; (b) that Cornerstone Network actually had a valid assignment of benefits from E.D.; and

(c) that some legitimate, reparative Glass Services actually had been provided to E.D.

(xiv)  On or about May 4, 2015, the Cornerstone Owners submitted a claim through Cornerstone Network to GEICO in the amount of $161.25 for Glass Services purportedly provided to an Insured named G.B. The claim falsely represented: (a) that Cornerstone Network actually provided the Glass Services; (b) that Cornerstone Network actually had a valid assignment of benefits from G.B.; and (c) that some legitimate, reparative Glass Services actually had been provided to G.B.

(xv)  On or about May 4, 2015, the Cornerstone Owners submitted a claim through Cornerstone Network to GEICO in the amount of $161.25 for Glass Services purportedly provided to an Insured named A.F. The claim falsely represented: (a) that Cornerstone Network actually provided the Glass Services; (b) that Cornerstone Network actually had a valid assignment of benefits from A.F.; and (c) that some legitimate, reparative Glass Services actually had been provided to A.F.

(xvi)  On or about May 4, 2015, the Cornerstone Owners submitted a claim through Cornerstone Network to GEICO in the amount of $161.25 for Glass Services purportedly provided to an Insured named S.M. The claim falsely represented: (a) that Cornerstone Network actually provided the Glass Services; (b) that Cornerstone Network actually had a valid assignment of benefits from S.M.; and (c) that some legitimate, reparative Glass Services actually had been provided to S.M.

(xvii)  On or about May 14, 2015, the Cornerstone Owners submitted a claim through Cornerstone Network to GEICO in the amount of $161.25 for Glass Services purportedly provided to an Insured named B.R. The claim falsely represented: (a) that Cornerstone Network actually provided the Glass Services; (b) that Cornerstone Network actually had a valid assignment of benefits from B.R.; and (c) that some legitimate, reparative Glass Services actually had been provided to B.R.

(xviii)  On or about June 5, 2015, the Cornerstone Owners submitted a claim through Cornerstone Network to GEICO in the amount of $652.10 for Glass Services purportedly provided to an Insured named B.A. The claim falsely represented: (a) that Cornerstone Network actually provided the Glass Services; (b) that Cornerstone Network actually had a valid assignment of benefits from B.A.; and (c) that some legitimate, reparative Glass Services actually had been provided to B.A.

(xix)  On or about July 9, 2015, the Cornerstone Owners submitted a claim through Cornerstone Network to GEICO in the amount of $1,062.88 for Glass Services purportedly provided to an Insured named D.H. The claim falsely represented: (a)

that Cornerstone Network actually provided the Glass Services; (b) that Cornerstone Network actually had a valid assignment of benefits from D.H.; and (c) that some legitimate, reparative Glass Services actually had been provided to D.H.

(xx) On or about August 11, 2015, the Cornerstone Owners submitted a claim through Cornerstone Network to GEICO in the amount of $161.25 for Glass Services purportedly provided to an Insured named J.S. The claim falsely represented: (a) that Cornerstone Network actually provided the Glass Services; (b) that Cornerstone Network actually had a valid assignment of benefits from J.S.; and (c) that some legitimate, reparative Glass Services actually had been provided to J.S.

## C.   The Exploitation of Florida Insurance Claims Handling Requirements to Conceal and Perpetuate the Scheme

117.   As set forth above, in a legitimate claim for Glass Services, Insureds typically provide a notice of their loss to GEICO, and – as part of that process – provide GEICO with the name of their preferred glass repair or replacement shop. GEICO then sends a work order to the preferred shop, and the preferred shop then submits a claim to GEICO with the work order number when the work is complete.

118.   Again, this notice of loss process plays an important role in ensuring that the windshield repair and replacement claims that GEICO receives are legitimate. Among other things, it ensures that the windshield repair and replacement shops actually have received legitimate assignments of benefits from GEICO Insureds. It also ensures that the Insureds are aware of the fact that the glass repair and replacement shops have purported to perform work on the Insureds' windshields, and have submitted claims for reimbursement under the Insureds' comprehensive insurance policies.

119.   In order to conceal and perpetuate the Defendants' scheme, the Cornerstone Owners and Cornerstone Companies never followed the ordinary notice of loss process.

120.    The Cornerstone Owners and Cornerstone Companies never followed the ordinary notice of loss process because – if they had – GEICO would have contacted the Insureds to, among other things, verify the claims and identify the Insureds' preferred glass repair or replacement shops.

121.    The Insureds then would be on notice of the fact that the Cornerstone Companies were falsely purporting to have assignments of benefits from the Insureds, and were falsely claiming to have performed Glass Services for the Insureds. By extension, the Insureds would be likely to advise GEICO that the Cornerstone Companies were engaged in fraud.

122.    Instead, to conceal and perpetuate their scheme, the Cornerstone Owners and Cornerstone Companies submitted virtually of their claims for Glass Services to GEICO between two and four weeks _after_ they had purported to provide the pertinent Glass Services.

123.    As set forth above, the Defendants knew that – upon receipt of an invoice for windshield repair or replacement services provided to an Insured with comprehensive insurance coverage, Florida law generally permits insurers such as GEICO only 30 days to handle the claim. See, e.g., Fla. Stat. § 626.9541.

124.    The Defendants also knew that, if insurers such as GEICO do not pay a claim within 30 days, or present some good reason for denying or investigating the claim, they can be liable to the Insured or the Insured's assignee for damages, as well as attorneys' fees, under the Florida Unfair Insurance Trade Practices Act. See id.; see also Fla. Stat. § 624.155.

125.    In this context, Cornerstone Owners and Cornerstone Companies submitted virtually of their claims for Glass Services to GEICO between two and four weeks _after_ they had purported to provide the pertinent Glass Services because they knew that: (i) this time-frame severely limited GEICO's ability to verify the claims; and (ii) forced GEICO to rely on the

claims or else face the prospect of suits for damages and attorneys' fees under the Florida Unfair Insurance Trade Practices Act.

**III.    The Fraudulent Claims the Defendants Submitted or Caused to be Submitted to GEICO**

126.    To support the fraudulent charges, the Defendants systematically submitted or caused to be submitted hundreds of claims to GEICO through the Cornerstone Companies seeking payment for Glass Services for which the Cornerstone Companies were not entitled to receive payment.

127.    Each and every one of the claims for Glass Services identified in Exhibits "1" and "2" was submitted via interstate facsimile transmission from the Cornerstone Companies in Florida, to GEICO's claims offices in Macon, Georgia.

128.    The claims that the Defendants submitted or caused to be submitted to GEICO were false and misleading in the following material respects:

(i)    The claims for Glass Services that the Defendants submitted or caused to be submitted through the Cornerstone Companies uniformly misrepresented to GEICO that the Cornerstone Companies had valid assignments of benefits from the pertinent Insureds and had performed the underlying Glass Services. In fact, the Cornerstone Companies never had valid assignments of benefits from the pertinent Insureds, never performed the underlying Glass Services, and lacked standing to collect on the claims in the first instance.

(ii)    The claims for Glass Services that the Defendants submitted or caused to be submitted through the Cornerstone Companies uniformly misrepresented to GEICO that the Glass Services actually were reparative and were performed by the Cornerstone Companies. In fact, the Glass Services never had any legitimate reparative value, and frequently never were performed – by anyone – in the first instance.

IV.     **The Defendants' Fraudulent Concealment and GEICO's Justifiable Reliance**

129.    The Defendants were legally and ethically obligated to act honestly and with integrity in connection with their performance of the purported Glass Services and their submission of charges to GEICO

130.    To induce GEICO to promptly pay the fraudulent charges for the Glass Services, the Defendants have systemically concealed their fraud and have gone to great lengths to accomplish this concealment.

131.    Specifically, the Defendants knowingly misrepresented and concealed facts related to the Glass Services in an effort to prevent discovery that the Cornerstone Companies never performed the underlying Glass Services, lacked valid assignments of benefits from the pertinent Insureds, and therefore lacked standing to collect on the Glass Services in the first instance.

132.    What is more, the Defendants knowingly misrepresented and concealed facts related to the Glass Services in an effort to prevent discovery that the Glass Services never had any legitimate reparative value, and frequently never were performed – by anyone – in the first instance.

133.    Moreover, the Cornerstone Owners carried out their fraudulent scheme through two separate entities using two separate tax identification numbers in order to reduce the amount of fraudulent billing submitted through any one entity, avoid detection, and thereby conceal and perpetuate their scheme.

134.    Furthermore, the Cornerstone Owners and Cornerstone Companies deliberately avoided the ordinary notice of loss process and exploited Florida's claims handling requirements

in order to force GEICO to process their fraudulent claims within a highly abbreviated time-frame, and compel GEICO to rely on their facially-valid claims submissions.

135.    The Defendants have hired law firms to pursue collection of the fraudulent charges from GEICO and other insurers. These law firms routinely file expensive and time-consuming litigation against GEICO and other insurers if the charges are not promptly paid in full.

136.    GEICO is under statutory and contractual obligations to promptly and fairly process claims within 30 days. The facially-valid documents submitted to GEICO in support of the fraudulent charges at issue, combined with the material misrepresentations described above, were designed to and did cause GEICO to rely upon them. As a result, GEICO has incurred damages of more than $223,000.00.

137.    Based upon the Defendants' material misrepresentations and other affirmative acts to conceal their fraud from GEICO, GEICO did not discover and could not reasonably have discovered that its damages were attributable to fraud until shortly before it filed this Complaint.

### FIRST CAUSE OF ACTION
**Against Cornerstone Network and Cornerstone Mobile**
**(Declaratory Judgment – 28 U.S.C. §§ 2201 and 2202)**

138.    GEICO incorporates, as though fully set forth herein, each and every allegation in paragraphs 1 through 137 above.

139.    There is an actual case in controversy between GEICO, Cornerstone Network, and Cornerstone Mobile regarding more than $175,000.00 in fraudulent claims for the purported Glass Services that has been submitted to GEICO.

140. Cornerstone Network and Cornerstone Mobile have no right to receive payment for any pending claims submitted to GEICO because the claims misrepresented that Cornerstone Network and Cornerstone Mobile provided the underlying services, when in fact they did not.

141. Cornerstone Network and Cornerstone Mobile have no right to receive payment for any pending bills submitted to GEICO because the bills mispresented that Cornerstone Network and Cornerstone Mobile were in possession of valid assignments of benefits from each Insured, when in fact they were not.

142. Cornerstone Network and Cornerstone Mobile have no right to receive payment for any pending claims submitted to GEICO because the claims misrepresented that the billed-for services actually constituted legitimate windshield repairs and replacement, when in fact they did not.

143. Cornerstone Network and Cornerstone Mobile have no right to receive payment for any pending claims submitted to GEICO because the claims misrepresented that the billed-for services were actually provided, when in fact they were not.

144. Accordingly, GEICO requests a judgment pursuant to the Declaratory Judgment Act, 28 U.S.C. §§ 2201 and 2202, declaring that Cornerstone Network and Cornerstone Mobile have no right to receive payment for any pending claims submitted to GEICO.

**SECOND CAUSE OF ACTION**
**Against Fry, Praphatsarang, and Hamilton**
**(Violation of RICO, 18 U.S.C. § 1962(c))**

145. GEICO incorporates, as though fully set forth herein, each and every allegation in paragraphs 1 through 144 above.

146. Cornerstone Network, Inc. is an ongoing "enterprise," as that term is defined in 18 U.S.C. § 1961(4), that engages in activities that affected interstate commerce.

147.    Fry, Praphatsarang, and Hamilton have knowingly conducted and/or participated, directly or indirectly, in the conduct of Cornerstone Network's affairs through a pattern of racketeering activity consisting of repeated violations of the federal wire fraud statute, 18 U.S.C. § 1343, based upon the use of the wires in interstate commerce to submit or cause to be submitted hundreds of fraudulent claims for Glass Services on a continuous basis for more than 18 months seeking insurance payments under GEICO insurance policies that Cornerstone Network was never entitled to receive because: (i) Cornerstone Network never actually provided any Glass Services to GEICO Insureds and lacked valid assignments of benefits from GEICO Insureds; and (ii) the Glass Services never had any legitimate reparative value, and frequently never were performed – by anyone – in the first instance. A representative sample of the fraudulent bills and corresponding facsimiles submitted to GEICO that comprise, in part, the pattern of racketeering activity identified through the date of this Complaint are described, in part, in the chart annexed hereto as Exhibit "2".

148.    Cornerstone Network's business is racketeering activity, inasmuch as the enterprise exists solely for the purpose of submitting fraudulent charges to Florida automobile insurers.  The predicate acts of wire fraud are the regular way in which Fry, Praphatsarang, and Hamilton operate Cornerstone Network, insofar as Cornerstone Network was never eligible to bill GEICO or other automobile insurers for the Glass Services, and the acts of wire fraud therefore are essential in order for Cornerstone Network to function.  Furthermore, the intricate planning required to carry out and conceal the predicate acts of wire fraud implies a threat of continued criminal activity, as does the fact that Fry, Praphatsarang, and Hamilton continue to attempt collection on the fraudulent billing submitted through Cornerstone Network to the present day.

149.    Cornerstone Network is engaged in inherently unlawful acts, inasmuch as it continues to submit and attempt collection on fraudulent billing submitted to GEICO and other insurers. These inherently unlawful acts are taken by Cornerstone Network in pursuit of inherently unlawful goals – namely, the theft of money from GEICO and other insurers through fraudulent Glass Services billing.

150.    GEICO has been injured in its business and property by reason of the above-described conduct in that it has paid at least $39,618.61 pursuant to the fraudulent claims submitted through Cornerstone Network.

151.    By reason of its injury, GEICO is entitled to treble damages, costs, and reasonable attorneys' fees pursuant to 18 U.S.C. § 1964(c), and any other relief the Court deems just and proper.

### THIRD CAUSE OF ACTION
**Against Fry, Praphatsarang, and Hamilton**
**(Violation of RICO, 18 U.S.C. § 1962(c))**

152.    GEICO incorporates, as though fully set forth herein, each and every allegation in paragraphs 1 through 150 above.

153.    Fry Enterprises, Inc. d/b/a Cornerstone Mobile Glass is an ongoing "enterprise," as that term is defined in 18 U.S.C. § 1961(4), that engages in activities that affected interstate commerce.

154.    Fry, Praphatsarang, and Hamilton have knowingly conducted and/or participated, directly or indirectly, in the conduct of Cornerstone Mobile's affairs through a pattern of racketeering activity consisting of repeated violations of the federal wire fraud statute, 18 U.S.C. § 1343, based upon the use of the wires in interstate commerce to submit or cause to be submitted hundreds of fraudulent claims for Glass Services on a continuous basis for more than

three years seeking insurance payments under GEICO insurance policies that Cornerstone Mobile was never entitled to receive because: (i) Cornerstone Mobile never actually provided any Glass Services to GEICO Insureds and lacked valid assignments of benefits from GEICO Insureds; and (ii) the Glass Services never had any legitimate reparative value, and frequently never were performed – by anyone – in the first instance. A representative sample of the fraudulent bills and corresponding facsimiles submitted to GEICO that comprise, in part, the pattern of racketeering activity identified through the date of this Complaint are described, in part, in the chart annexed hereto as Exhibit "1".

155.   Cornerstone Mobile's business is racketeering activity, inasmuch as the enterprise exists solely for the purpose of submitting fraudulent charges to Florida automobile insurers. The predicate acts of wire fraud are the regular way in which Fry, Praphatsarang, and Hamilton operate Cornerstone Mobile, insofar as Cornerstone Mobile was never eligible to bill GEICO or other automobile insurers for the Glass Services, and the acts of wire fraud therefore are essential in order for Cornerstone Mobile to function.   Furthermore, the intricate planning required to carry out and conceal the predicate acts of wire fraud implies a threat of continued criminal activity, as does the fact that Fry, Praphatsarang, and Hamilton continue to attempt collection on the fraudulent billing submitted through Cornerstone Mobile to the present day.

156.   Cornerstone Mobile is engaged in inherently unlawful acts, inasmuch as it continues to submit and attempt collection on fraudulent billing submitted to GEICO and other insurers. These inherently unlawful acts are taken by Cornerstone Mobile in pursuit of inherently unlawful goals – namely, the theft of money from GEICO and other insurers through fraudulent Glass Services billing.

157.     GEICO has been injured in its business and property by reason of the above-described conduct in that it has paid at least $184,163.31 pursuant to the fraudulent claims submitted through Cornerstone Mobile.

158.     By reason of its injury, GEICO is entitled to treble damages, costs, and reasonable attorneys' fees pursuant to 18 U.S.C. § 1964(c), and any other relief the Court deems just and proper.

## FOURTH CAUSE OF ACTION
### Against Fry, Hamilton, Praphatsarang, M&J Glass, Mika, Johnson, Garcia, ABS, and John Doe Defendants 1-10
### (Violation of RICO, 18 U.S.C. § 1962(d))

159.     GEICO incorporates, as though fully set forth herein, each and every allegation in paragraphs 1 through 157 above.

160.     Cornerstone Network, Inc. is an ongoing "enterprise," as that term is defined in 18 U.S.C. § 1961(4), that engages in activities that affected interstate commerce.

161.     Fry, Hamilton, Praphatsarang, M&J Glass, Mika, Johnson, Garcia, ABS, and John Doe Defendants 1-10 are employed by and/or associated with the Cornerstone Network enterprise.

162.     Fry, Hamilton, Praphatsarang, M&J Glass, Mika, Johnson, Garcia, ABS, and John Doe Defendants 1-10 knowingly have agreed, combined and conspired to conduct and/or participate, directly or indirectly, in the conduct of the Cornerstone Network enterprise's affairs through a pattern of racketeering activity consisting of repeated violations of the federal wire fraud statute, 18 U.S.C. § 1343, based upon the use of the wires in interstate commerce to submit or cause to be submitted hundreds of fraudulent claims for Glass Services on a continuous basis for more than 18 months seeking insurance payments under GEICO insurance policies that Cornerstone Network was never entitled to receive because: (i) Cornerstone Network never

actually provided any Glass Services to GEICO Insureds and lacked valid assignments of benefits from GEICO Insureds; and (ii) the Glass Services never had any legitimate reparative value, and frequently never were performed – by anyone – in the first instance. A representative sample of the fraudulent bills and corresponding claim submissions submitted to GEICO using wires in interstate commerce that comprise, in part, the pattern of racketeering activity identified through the date of this Complaint are described, in part, in the charts annexed hereto as Exhibit "2". Each such wire transmission was made in furtherance of the wire fraud scheme.

163.    Fry, Hamilton, Praphatsarang, M&J Glass, Mika, Johnson, Garcia, ABS, and John Doe Defendants 1-10 knew of, agreed to and acted in furtherance of the common and overall objective (i.e., to defraud GEICO and other automobile insurers of money) by submitting or facilitating the submission of the fraudulent charges to GEICO.

164.    GEICO has been injured in its business and property by reason of the above-described conduct in that it has paid at least $39,618.61 pursuant to the fraudulent bills submitted through the Cornerstone Network enterprise.

165.    By reason of its injury, GEICO is entitled to treble damages, costs, and reasonable attorneys' fees pursuant to 18 U.S.C. §1964(c), and any other relief the Court deems just and proper.

**FIFTH CAUSE OF ACTION**
**Against Fry, Hamilton, Praphatsarang, M&J Glass, Mika, Johnson, Garcia,**
**ABS, and John Doe Defendants 1-10**
**(Violation of RICO, 18 U.S.C. § 1962(d))**

166.    GEICO incorporates, as though fully set forth herein, each and every allegation in paragraphs 1 through 164 above.

167.  Fry Enterprises, Inc. d/b/a Cornerstone Mobile Glass is an ongoing "enterprise," as that term is defined in 18 U.S.C. § 1961(4), that engages in activities that affected interstate commerce.

168.  Fry, Hamilton, Praphatsarang, M&J Glass, Mika, Johnson, Garcia, ABS, and John Doe Defendants 1-10 are employed by and/or associated with the Cornerstone Mobile enterprise.

169.  Fry, Hamilton, Praphatsarang, M&J Glass, Mika, Johnson, Garcia, ABS, and John Doe Defendants 1-10 knowingly have agreed, combined and conspired to conduct and/or participate, directly or indirectly, in the conduct of the Cornerstone Mobile enterprise's affairs through a pattern of racketeering activity consisting of repeated violations of the federal wire fraud statute, 18 U.S.C. § 1343, based upon the use of the wires in interstate commerce to submit or cause to be submitted hundreds of fraudulent claims for Glass Services on a continuous basis for more than three years seeking insurance payments under GEICO insurance policies that Cornerstone Mobile was never entitled to receive because: (i) Cornerstone Mobile never actually provided any Glass Services to GEICO Insureds and lacked valid assignments of benefits from GEICO Insureds; and (ii) the Glass Services never had any legitimate reparative value, and frequently never were performed – by anyone – in the first instance. A representative sample of the fraudulent bills and corresponding claim submissions submitted to GEICO using wires in interstate commerce that comprise, in part, the pattern of racketeering activity identified through the date of this Complaint are described, in part, in the charts annexed hereto as Exhibit "1". Each such wire transmission was made in furtherance of the wire fraud scheme.

170.  Fry, Hamilton, Praphatsarang, M&J Glass, Mika, Johnson, Garcia, ABS, and John Doe Defendants 1-10  knew of, agreed to and acted in furtherance of the common and overall

objective (i.e., to defraud GEICO and other automobile insurers of money) by submitting or facilitating the submission of the fraudulent charges to GEICO.

171.    GEICO has been injured in its business and property by reason of the above-described conduct in that it has paid at least $184,163.31 pursuant to the fraudulent bills submitted through the Cornerstone Mobile enterprise.

172.    By reason of its injury, GEICO is entitled to treble damages, costs, and reasonable attorneys' fees pursuant to 18 U.S.C. §1964(c), and any other relief the Court deems just and proper.

## SIXTH CAUSE OF ACTION
### Against all Defendants
### (Under Fla. Stat. 501.201 et. seq.)

173.    GEICO incorporates, as fully set forth herein, each and every allegation in paragraphs 1 through 171 above.

174.    The Defendants are actively engaged in trade and commerce in the State of Florida.

175.    GEICO and its Insureds are "consumers" as defined by Fla. Stat. 501.203.

176.    The Defendants engaged in unfair, deceptive, and unconscionable acts or trade practices in their trade or commerce in the pursuit and execution of their scheme to illegally-obtain insurance information and signatures from Insureds for use in their fraudulent claims and their submission of said claims to GEICO.

177.    The claims and supporting documents submitted to GEICO in connection with the billed-for-services were fraudulent in that: (i) the Cornerstone Companies never actually provided any Glass Services to GEICO Insureds and lacked valid assignments of benefits from

GEICO Insureds; and (ii) the Glass Services never had any legitimate reparative value, and frequently never were performed – by anyone – in the first instance.

178.    Such acts and practices offend public policy and are immoral, unethical, oppressive, and unscrupulous.  Additionally, the conduct of the Defendants has been materially injurious to GEICO and its Insureds.

179.    The conduct of the Defendants was the actual and proximate cause of the damages sustained by GEICO.

180.    Defendants' unfair and deceptive acts have caused GEICO to sustain damages of at least $223,000.00.

181.    By reason of Defendants' conduct, GEICO is also entitled to recover costs, and reasonable attorneys' fees pursuant to Fla. Stat. 501.211(2).

**SEVENTH CAUSE OF ACTION**
**Against all Defendants**
**(Under Fla. Stat. 772.103 et. seq.)**

182.    GEICO incorporates, as fully set forth herein, each and every allegation in paragraphs 1 through 180 above.

183.    In furtherance of the fraudulent scheme, the Defendants submitted or caused to be submitted thousands of fraudulent bills to GEICO seeking payment pursuant under automobile insurance policies issued by GEICO to Florida Insureds.

184.    When the billing was submitted, the Defendants knew that the billing contained false and misleading information concerning facts material to the claims for which reimbursement was being sought in that: (i) the Cornerstone Companies never actually provided any Glass Services to GEICO Insureds and lacked valid assignments of benefits from GEICO

Insureds; and (ii) the Glass Services never had any legitimate reparative value, and frequently never were performed – by anyone – in the first instance.

185.   These knowing and intentional acts constitute a pattern of criminal activity, in that said acts constitute insurance fraud in violation of 817.234(1)(a).

186.   This pattern of criminal activity resulted in the Cornerstone Owners and the Cornerstone Companies receiving hundreds of thousands of dollars of comprehensive insurance reimbursement to which they were not entitled.

187.   Defendants' pattern of criminal activity has caused GEICO to sustain damages of at least $223,000.00.

188.   By reason of Defendants' conduct, GEICO is also entitled to recover threefold the actual damages it actually sustained, reasonable attorney's fees, and court costs pursuant to Fla. Stat. 772.104.

## EIGHTH CAUSE OF ACTION
### Against the Cornerstone Companies and the Cornerstone Owners
### (Common Law Fraud)

189.   GEICO incorporates, as though fully set forth herein, each and every allegation in paragraphs 1 through 187 above.

190.   Fry, Hamilton, Praphatsarang, Cornerstone Mobile, and Cornerstone Network intentionally and knowingly made false and fraudulent statements of material fact to GEICO in the course of their submission of thousands of fraudulent bills.

191.   The bills submitted to GEICO constituted false and fraudulent statements of material fact in that: (i) the Cornerstone Companies never actually provided any Glass Services to GEICO Insureds and lacked valid assignments of benefits from GEICO Insureds; and (ii) the

Glass Services never had any legitimate reparative value, and frequently never were performed – by anyone – in the first instance.

192.    Fry, Hamilton, Praphatsarang, Cornerstone Mobile, and Cornerstone Network intentionally made the above-described false and fraudulent statements and concealed material facts in a calculated effort to induce GEICO to pay charges submitted through Cornerstone Network and Cornerstone Mobile that were not reimbursable.

193.    GEICO justifiably relied on these false and fraudulent representations and acts of fraudulent concealment, and as a proximate result has been injured in its business and property by reason of the above-described conduct in that it has paid at least $223,000.00 pursuant to the fraudulent bills that were submitted by the Cornerstone Companies and Cornerstone Owners.

194.    The Defendants' extensive fraudulent conduct demonstrates a high degree of moral turpitude and wanton dishonesty that entitles GEICO to recover punitive damages.

195.    Accordingly, by virtue of the foregoing, GEICO is entitled to compensatory and punitive damages, together with interest and costs, and any other relief the Court deems just and proper.

### NINTH CAUSE OF ACTION
**Against M&J Glass, Mika, Johnson, Garcia,
ABS, and John Doe Defendants 1-10
(Aiding and Abetting Fraud)**

196.    GEICO incorporates, as though fully set forth herein, each and every allegation in paragraphs 1 through 194 above.

197.    M&J Glass, Mika, Johnson, Garcia, ABS, and John Doe Defendants 1-10 knowingly aided and abetted the fraudulent scheme that was perpetrated on GEICO by the Cornerstone Owners and Cornerstone Companies.

198.    The acts of M&J Glass, Mika, Johnson, Garcia, ABS, and John Doe Defendants 1-10 in furtherance of the fraudulent scheme included: (i) establishing relationships with and paying kickbacks to Florida car dealerships and car wash locations to gain access to the large volume of Insureds who visited the car dealerships and car wash locations; (ii) committing illegal, deceptive, and manipulative acts against the Insureds at the car dealerships and car wash locations, in order to unlawfully obtain the Insureds' signatures and insurance information; and (iii) using the Insureds' signatures and insurance information – without the Insureds' knowledge or consent – to create and submit fraudulent insurance claims to GEICO and other insurers for Glass Services, despite the fact that the putative Glass Services were unnecessary, had no reparative effect, or never were provided in the first instance.

199.    The conduct of M&J Glass, Mika, Johnson, Garcia, ABS, and John Doe Defendants 1-10 in furtherance of the fraudulent scheme was significant and material. The conduct of M&J Glass, Mika, Johnson, Garcia, ABS, and John Doe Defendants 1-10 was a necessary part of and was critical to the success of the fraudulent scheme because, without their actions, there would have been no opportunity for the Cornerstone Companies and Cornerstone Owners to obtain payment from GEICO and from other insurers.

200.    M&J Glass, Mika, Johnson, Garcia, ABS, and John Doe Defendants 1-10 aided and abetted the fraudulent scheme in a calculated effort to induce GEICO into paying charges to the Cornerstone Companies and Cornerstone Owners for fraudulent and unreimbursable Glass Services because they sought to continue profiting through the fraudulent scheme.

201.    The conduct of the M&J Glass, Mika, Johnson, Garcia, ABS, and John Doe Defendants 1-10 caused GEICO to pay more than $223,000.00 pursuant to the fraudulent bills submitted through the Cornerstone Companies.

202.    The Defendants' extensive fraudulent conduct demonstrates a high degree of moral turpitude and wanton dishonesty that entitles GEICO to recover punitive damages.

203.    Accordingly, by virtue of the foregoing, GEICO is entitled to compensatory and punitive damages, together with interest and costs, and any other relief the Court deems just and proper.

**TENTH CAUSE OF ACTION**
**Against all Defendants**
**(Unjust Enrichment)**

204.    GEICO incorporates, as fully set forth herein, each and every allegation in paragraphs 1 through 202 above.

205.    As set forth above, the Defendants have engaged in improper, unlawful, and/or unjust acts, all to the harm and detriment of GEICO.

206.    When GEICO paid the bills and charges submitted or caused to be submitted by the Defendants, it reasonably believed that it was legally obligated to make such payments based on the Defendants' improper, unlawful, and/or unjust acts.

207.    The Defendants have been enriched at GEICO's expense by GEICO's payments which constituted a benefit that the Defendants voluntarily accepted notwithstanding their improper, unlawful, and unjust billing scheme.

208.    The Defendants' retention of GEICO's payments violates fundamental principles of justice, equity and good conscience.

209.    By reason of the above, the Defendants have been unjustly enriched in an amount to be determined at trial, but in no event less than $223,000.00.

## JURY DEMAND

210.    Pursuant to Federal Rule of Civil Procedure 38(b), Plaintiffs demand a trial by jury.

**WHEREFORE**, Plaintiffs Government Employees Insurance Co., GEICO Indemnity Co., GEICO General Insurance Company and GEICO Casualty Co. demand that a Judgment be entered in their favor:

A.    On the First Cause of Action against Cornerstone Network and Cornerstone Mobile, a declaration pursuant to the Declaratory Judgment Act, 28 U.S.C. §§ 2201 and 2202, that Cornerstone Network and Cornerstone Mobile have no right to receive payment for any pending bills submitted to GEICO;

B.    On the Second Cause of Action against Fry, Praphatsarang, and Hamilton, compensatory damages in favor of GEICO in an amount to be determined at trial but in excess of $39,618.61, together with treble damages, costs, and reasonable attorneys' fees pursuant to 18 U.S.C. § 1964(c) plus interest;

C.    On the Third Cause of Action against Fry, Praphatsarang, and Hamilton, compensatory damages in favor of GEICO in an amount to be determined at trial but in excess of $184,163.31, together with treble damages, costs, and reasonable attorneys' fees pursuant to 18 U.S.C. § 1964(c) plus interest;

D.    On the Fourth Cause of Action against Fry, Hamilton, Praphatsarang, M&J Glass, Mika, Johnson, Garcia, ABS, and John Doe Defendants 1-10, compensatory damages in favor of GEICO an amount to be determined at trial but in excess of $39,618.61, together with treble damages, costs, and reasonable attorneys' fees pursuant to 18 U.S.C. § 1964(c) plus interest;

E.      On the Fifth Cause of Action against Fry, Hamilton, Praphatsarang, M&J Glass, Mika, Johnson, Garcia, ABS, and John Doe Defendants 1-10, compensatory damages in an amount to be determined at trial but in excess of $184,163.31, together with treble damages, costs, and reasonable attorneys' fees pursuant to 18 U.S.C. § 1964(c) plus interest;

F.      On the Sixth Cause of Action against all Defendants, compensatory damages in an amount to be determined at trial but in excess of $223,000.00, together with costs and reasonable attorneys' fees pursuant to Fla. Stat. 501.211(2);

G.      On the Seventh Cause of Action against all Defendants, compensatory damages in an amount to be determined at trial but in excess of $223,000.00, together with treble damages, reasonable attorney's fees, and court costs pursuant to Fla. Stat. 772.104;

H.      On the Eighth Cause of Action against Fry, Hamilton, Praphatsarang, Cornerstone Mobile, and Cornerstone Network, compensatory damages in an amount to be determined at trial but in excess of $223,000.00, together with punitive damages, costs, interest and such other and further relief as this Court deems just and proper;

I.      On the Ninth Cause of Action against M&J Glass, Mika, Johnson, Garcia, ABS, and John Doe Defendants 1-10, compensatory damages in an amount to be determined at trial but in excess of $223,000.00, together with punitive damages, costs, interest and such other and further relief as this Court deems just and proper; and

J.      On the Tenth Cause of Action against all Defendants, more than $223,000.00 in compensatory damages, plus costs and interest and such other and further relief as this Court deems just and proper.

Dated:        June 9, 2016

_Kristen W. Bracken_
Lindsey R. Trowell, Esq., Trial Counsel
Florida Bar No. 678783
John P. Marino, Esq.
Florida Bar No. 814539
Kristen W. Bracken, Esq.
Florida Bar No. 92136
SMITH, GAMBRELL & RUSSELL, LLP
50 North Laura Street - Suite 2600
Jacksonville, Florida 32202
Telephone (904) 598-6125
Facsimile (904) 598-6225
ltrowell@sgrlaw.com

-and-

Barry I. Levy, Esq. (to be admitted *pro hac vice*)
Max Gershenoff, Esq. (to be admitted *pro hac vice*)
Steven Henesy, Esq. (to be admitted *pro hac vice*)
RIVKIN RADLER LLP
926 RXR Plaza, Uniondale, New York 11550
Telephone (516) 357-3000

*Counsel for Plaintiffs, Government Employees Insurance Co., GEICO Indemnity Co., GEICO General Insurance Company and GEICO Casualty Co.*